FILED

SEP 2 9 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Marcial Antonio Riquelme, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civ. Action No. 02-2382 (RJL) |
| | ) |
| Central Intelligence Agency, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION
(September **29** 2006) [#22, 26]

Currently before the Court are cross motions for summary judgment filed on behalf

of defendant, the Central Intelligence Agency ("CIA" or "Agency"), and plaintiff, Marcial

Antonio Riquelme, in this Freedom of Information Act action. After due consideration of

the parties' submissions, the relevant law, and the entire record herein, defendant's Motion

for Summary Judgment is GRANTED and plaintiff's Cross-Motion is DENIED.

## BACKGROUND

Plaintiff brings this action under the Freedom of Information Act ("FOIA" or "Act"),

5 U.S.C. §§ 552 *et seq.* (2000), seeking the production of documents from defendant

"regarding certain United States activities in Paraguay during certain years within the period

ranging from 1970 to 1984."[1] (Compl. at Intro.) On May 17, 2000, plaintiff submitted a

---

[1]    While the alleged United States activity occurred within the time period of 1970 to
1984, plaintiff's actual FOIA request included documents generated in1952 to the present. *See infra*
note 2.

1



letter to the CIA, requesting documents that contain seven categories of information.[2] (*See*

*id.* ¶ 5; Am. Answer Ex. A; Decl. of Marilyn A. Dorn ("Dorn Decl.")[3] Ex. 1.) The CIA

replied on June 15, 2000, by denying plaintiff's request with respect to Items 1-2 and 4-7,

and directing him to contact the United States Army with respect to Item 3. (*See* Dorn Decl.

---

[2]     The seven categories of information were:

1.     Activities of agents or agencies of the government of the United States of America in connection with the ascension to power of General Alfredo Stroessner in Paraguay. This request encompasses the period from January 1, 1952, through May 30, 1954. ("Item 1");

2.     Assistance by agents or agencies of the government of the United States of America in the creation or operation of the Office of Technical Affairs ("La Technica") in the Ministry of the Interior of Paraguay, including the appointment (as advisor) of Col. Robert Thierry.   This request encompasses the period of General Stroessner's presidency, that is, from 1954 through 1989. ("Item 2");

3.     The nature and scope of training programs offered by the School of the Americans in which officers of the armed forces of Paraguay participated. ("Item 3");

4.     Participation by agents or agencies of the government of the United States of America in coordination among security agencies in the Southern Cone (and specifically those of the governments of Paraguay, Chile, Argentin[a], Brazil, Uruguay, and/or Bolivia), whether within or outside of the organization generally referred to as "Operation Condor." This request encompasses the period 1976 through 1997. ("Item 4");

5.     Involvement from 1998 through the present by agents or agencies of the government of the United States of America in the deposition of General Stroessner and/or in the opening stages of the political opening in the wake of his departure from power. ("Item 5");

6.     Contacts by agents or agencies of the government of the United States of America with General Lino Oviedo between January 1, 1989, an April 1, 1999. ("Item 6");

7.     Knowledge on the part of agents or agencies of the government of the United States of America concerning drug traffic in or through Paraguay during the period 1954 (the beginning of the Stroessner government) through the present. ("Item 7").

(Am. Answer Ex. A; Dorn Decl. Ex. 1.)

[3]     Ms. Dorn is the Information Review Officer for the Directorate of Operations of the CIA. (Dorn. Decl. ¶ 1.) Her declaration was submitted along with and in support of defendant's Motion for Summary Judgment.

Ex. 2.)  In its letter, the CIA indicated that the existence or nonexistence of the information requested in Items 1-2 and Items 4-7—unless it had been "officially acknowledged"—"would be classified for reasons of national security under Executive Order 12958." (*Id.*)  Moreover, the CIA indicated that it could "neither confirm nor deny the existence or nonexistence of records responsive to [plaintiff's] request" and that the request was therefore denied pursuant to FOIA exemptions (b)(1) ("Exemption (b)(1)") and (b)(3) ("Exemption (b)(3)"), codified at 5 U.S.C. § 552(b)(1) and (b)(3).[4] (*Id.*)  Plaintiff appealed the denial of his request in a letter dated July 27, 2000.  (*See* Dorn Decl. Ex. 3.)

In a December 14, 2000 letter to plaintiff, the CIA's Agency Release Panel affirmed the Agency's initial determination to deny the request, indicating "that the fact of the existence or nonexistence of any documents other than those previously released in regard to [I]tem 4 in response to [p]laintiff's request was classified information pursuant to Executive Order 12958 and exempt from disclosure under [Exemption (b)(1)], and would relate directly to information concerning intelligence sources and methods exempt from disclosure under [Exemption (b)(3)]."[5]  (Dorn Decl. ¶ 9 (citation omitted).)

---

[4]     FOIA Exemption (b)(1) exempts from production under the Act matters that are: "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order."  5 U.S.C. § 552(b)(1).  Exemption (b)(3) excepts those matters "specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld."  5 U.S.C. § 552(b)(3).

[5]     As a discretionary measure, the Agency Release Panel provided plaintiff with twenty-one previously released documents containing the term "Condor."  (Dorn Decl. ¶ 10.)  Although the

Plaintiff filed the instant action in this Court on December 6, 2002, seeking production of any and all documents responsive to his FOIA request. Since his May 17, 2000 letter to the CIA, plaintiff has withdrawn his requests for documents responsive to Items 3 (*see* Dorn Decl. Ex. 6) and 7 (*see* Dorn Decl. Ex. 8 at 1), and has narrowed Item 4 of the request (*see* Dorn Decl. Ex. 8 at 1). The CIA maintains that it refuses to "either confirm or deny the existence of records responsive to Items 1-2 and 4-6." (Dorn Decl. ¶ 14.)

### ANALYSIS

Summary judgment should be granted when the pleadings and record "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). According to FOIA, an agency asserting its right to withhold agency records pursuant to the Act's exemptions bears the burden of sustaining its action, and it is the Court's responsibility to review the matter *de novo*. 5 U.S.C. § 552(a)(4)(B). A federal agency moving for summary judgment in a FOIA action must prove, viewing the facts in the light most favorable to the requestor, that there is "no genuine issue of material fact" with respect to its compliance with FOIA. *Steinberg v. U.S. Dep't of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994) (citing *Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984)).

The moving party may meet its summary judgment burden by relying on affidavits or

_____

documents would not have been deemed responsive under the CIA's normal FOIA procedures, they were provided as "potentially of interest" to plaintiff given Item 4 of his request. (*Id.*)

4

declarations along with any other evidence. Fed. R. Civ. P. 56(e). Summary judgment on the basis of affidavits or declarations is only appropriate if the affidavits or declarations "describe . . . the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). A court conducting a *de novo* review of an agency's decision to invoke one of FOIA's exemptions is instructed to give "substantial weight" to agency affidavits. 5 U.S.C. § 552(a)(4)(B); *Halperin v. CIA*, 629 F.2d 144, 147-48 (D.C. Cir. 1980); *Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1384 (D.C. Cir. 1979). These affadavits may be submitted by an official who coordinated the search, and need not be from each individual who participated in the search. *See SafeCard Servs. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991). Thus, in the first instance, this Court must determine whether the CIA acted within the boundaries of FOIA when it denied plaintiff's request for documents "regarding certain United States activities in Paraguay during certain years within the period ranging from 1970 to 1984" (Compl. at Intro.) For the following reasons, the Court concludes it did. FOIA mandates that federal agencies comply with requests to make their records available to any person as long as the request "reasonably describes such records." 5 U.S.C. § 552(a)(3)(A)(i). Although "public access to government documents is the fundamental principle" behind FOIA, subsection (b) of the Act establishes nine exemptions meant to protect the "government's legitimate interest

in keeping certain information confidential." 5 U.S.C. §§ 552(b)(1-9); *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 925 (D.C. Cir. 2003) (citations omitted); *see also Assassination Archives & Research Ctr. v. CIA*, 334 F.3d 55, 57 (D.C. Cir. 2003).  The CIA has asserted that the records sought by the plaintiff are protected from production by Exemption (b)(1), which exempts from disclosure materials that have been properly classified in the interest of national defense or foreign policy pursuant to an Executive Order; and by Exemption (b)(3), which exempts materials that are specifically protected from disclosure by a statute other than FOIA.  (Def.'s Mem. P. & A. in Support of Def.'s Mot. Summ. J. ("Def.'s Mot. Summ. J.") at 1-2.)  Although defendant's response "refus[ing] to confirm or deny the existence of records" is relevant to both of the claimed exemptions, (Def.'s Mot. Summ. J. at 8), a "slightly different inquiry" is required with regard to the application of each, *Miller v. Casey*, 730 F.2d 773, 775 (D.C. Cir. 1984).

## I.    *FOIA Exemption (b)(1)*

Exemption (b)(1) of FOIA protects from production materials that are:   "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order."  5 U.S.C. § 552(b)(1).  Defendant contends that the information requested by plaintiff is properly classified under Executive Order 12958 (or "the Order"), which provides for the classification of information relating to, *inter alia*, intelligence activities (including special activities), intelligence sources or methods, and

foreign relations or activities of the United States. (*See* Def.'s Mot. Summ. J. at 8-9 (citing Exec. Order No. 12958 §§ 1.4(c)-(d),[6] 68 Fed. Reg. 15,315 (Mar. 25, 2003)).) According to the Order, an individual with original classification authority may classify such information if he determines that "the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security . . . and the original classification authority is able to identify or describe the damage." Exec. Order No. 12958 § 1.1(4). For the purposes of the Order, the "unauthorized disclosure of foreign government information is presumed to cause damage to the national security" and is thus subject to classification. *Id.* § 1.1(4)(c). Executive Order 12958 also states that in response to a FOIA request, "an agency may refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under [the] [O]rder or its predecessors." *Id.* § 3.6(a).

The CIA is responsible for "collecting, processing, analyzing, producing and disseminating foreign intelligence and counterintelligence, and performing other functions and activities related to foreign intelligence and national security as the President or Director of National Intelligence may direct." (Dorn. Decl. ¶ 18.) To carry out its charge, the Agency relies heavily upon secret relationships with "knowledgeable human sources" (*id.* ¶ 19), as well as on a variety of closely guarded intelligence methods[7] (*id.* ¶ 25). The Agency

---

[6]     All citations to Executive Order 12958 are to the Order as amended by Executive Order 13292.

[7]     "Intelligence methods include intelligence interests, capabilities, or techniques." (Dorn. Decl. ¶ 25.)

"must—and does—vigorously guard its intelligence sources and methods against unauthorized disclosure," because it operates in an environment where foreign intelligence services, terrorist groups, and other groups wishing to harm the [United States] have an extreme incentive to "know[] the CIA's capabilities, as well as which topics and persons are or were of interest to the CIA." (*Id.* ¶ 18.)

In the present case, the CIA has satisfied its burden regarding Exemption (b)(1) by demonstrating that the information requested by plaintiff is properly classified according to the criteria established by Executive Order 12958. *See Hayden*, 608 F.2d at 1387 (outlining the burden that FOIA places on the agency "to show (1) that it followed proper classification procedures, and (2) that by its description, the document logically falls within the claimed exception"). Defendant has provided an affidavit containing the Declaration of Marilyn A. Dorn, Information Review Officer for the Directorate of Operations of the CIA, in support of its decision to withhold the records requested by plaintiff. (*See generally* Dorn Decl.) Dorn, who as a senior CIA official holds original classification authority at the TOP SECRET level pursuant to Executive Order 12958 § 1.3(c) (*see* Dorn Decl. ¶ 3), characterizes plaintiff's FOIA request as one that would reveal whether or not the CIA:

1.    engaged in activities in connection with the ascension to power of General Alfredo Stroessner in Paraguay;
2.    assisted in the creation or operation of a particular component of the Paraguayan government (the Ministry of the Interior Office of Technical Affairs);
3.    participated in training officers of the Armed Services of Paraguay in the School of the Americas;
4.    participated in any coordination among security agencies of certain

8

South American countries;

5.    was involved in the deposition of General Stroessner and/or in the opening stages of the political opening in the wake of his departure from power; and/or

6.    had contact with a particular foreign national (i.e., General Lino Oviedo).

(Dorn Decl. ¶ 15 (citations omitted).)

The Dorn Declaration uses "reasonably specific detail" to justify the CIA's decision to invoke Exemption (b)(1) and to neither confirm nor deny the existence of responsive records, as required by *Military Audit Project.* 656 F.2d at 738. Dorn explains that because defendant has concluded there is a lack of any records demonstrating an overt or acknowledged connection "between [the] CIA and any of the individuals, activities, or potential items of intelligence interest that are the subjects of [p]laintiff's FOIA request," plaintiff seeks records, in the final analysis, that would only exist "if [the] CIA had engaged in clandestine activities, had established clandestine relationships, or had clandestine intelligence interests in the subjects and activities in the [p]laintiff's request." (Dorn Decl. ¶ 16.) By admitting that responsive documents in fact exist, the CIA would essentially confirm that it "undertook specific clandestine activities or had certain relationships in Paraguay" from 1952 to the present. (*Id.* ¶ 32.) The opposite response, confirming that the Agency does not possess any responsive documents, would establish that the CIA was not actively involved in Paraguay from 1952 to the present and would effectively lessen the burden on foreign intelligence services working "to track the CIA's clandestine relationships, activities, and intelligence interests." (*Id.* ¶ 32.) Accordingly, it is clear from the Dorn

9

Declaration that unauthorized revelations regarding the existence or nonexistence of such documents "reasonably could be expected to result in damage to the national security," Exec. Order No. 12958 § 1.1(4); thus, "the fact of their existence or nonexistence is itself classified under the Order," *id.* § 3.6(a), and the CIA may "refuse to confirm or deny the existence or non-existence of [the] requested records," *id.* (*See* Dorn. Decl. ¶ 16.)

Moreover, an affirmative response to plaintiff's request could not only "identify human intelligence sources and reveal information about the CIA's specific intelligence interests or activities" (Dorn Decl. ¶ 20), but also could betray the confidence of individuals who have put themselves and their families at risk to assist the CIA and "seriously damage this nation's ability to retain present sources and recruit new sources" (*id.* ¶¶ 22-23). The CIA's intelligence gathering efforts are highly dependent on information collected by, and acquired from "knowledgeable human sources." (*Id.* ¶ 19.) As indicated in the Dorn declaration, officially acknowledging that the CIA has recruited or collected intelligence information on a foreign national, or conducted clandestine activities in a foreign country, may also qualify for classification on the ground that it could "hamper future foreign relations with the government of that country, whether friend or adversary." (*Id.* ¶ 37.) A denial that the CIA has records responsive to a particular FOIA request, on the other hand, could serve to damage national security by alerting certain individuals that they are not CIA intelligence targets, thus "allowing [them] to continue to operate freely or ensuring . . . foreign intelligence agenc[ies] of the integrity of [their] information." (*Id.* ¶ 20.) Dorn

asserts that because there is not an acknowledged overt connection between the Agency and the individuals referenced in plaintiff's request, the CIA "must decline to reveal whether or not it possesses records related to that request."[8] (*Id.* ¶ 20.)

Finally, the defendant has also demonstrated that acknowledgment of clandestine activities in the present case, especially any covert CIA action relating to the ascension to power of General Stroessner, as described in Item 1; the creation of a government ministry, as described in Item 2; and/or the deposition of General Stroessner, as referenced in Item 5, "would adversely affect U.S. foreign relations" and may elicit retaliatory action against American citizens in the future. (*Id.* ¶ 38.) *See Afshar v. Dep't of State*, 702 F.2d 1125, 1130-31 (D.C. Cir. 1983) ("Unofficial leaks and public surmise can often be ignored by foreign governments that might perceive themselves to be harmed by disclosure of their cooperation with the CIA, but official acknowledgment may force a government to retaliate.").

---

[8]     The Dorn Declaration also describes how a response confirming the existence or nonexistence of the requested records has the potential to jeopardize the effectiveness of the Agency's intelligence methods and could actually provide assistance to entities seeking to "detect, prevent, or damage U.S. intelligence operations." (Dorn. Decl. ¶ 25.) Dorn demonstrates that if the CIA were to produce documents regarding clandestine operations in the region, it would be admitting it engaged in those activities and be providing its enemies with information regarding its operations and capabilities there. (*Id.* ¶ 26.) A denial of the Agency's participation in clandestine activities or intelligence gathering in the region, meanwhile, would alert other intelligence services and entities that their own clandestine activities within the area were not detected by the CIA and may thus continue unchecked. (*Id.* ¶ 27.) Dorn shows that disclosing the existence or nonexistence of this information could reasonably damage national security as it would greatly benefit foreign intelligence services at the expense of America's national security by providing them with information regarding the CIA's operations, intelligence sources, and capabilities while reducing the Agency's own effectiveness and causing it to lose valuable intelligence information. (*Id.* ¶ 33.)

Thus, through the assertions in its affidavit, the CIA has sufficiently shown that it properly invoked Exemption (b)(1). Accordingly, the Court finds that the damage to national security that could reasonably be expected to result from a response confirming or denying the existence of responsive documents should be classified according to Executive Order 12958 §§ 1.1(4), 3.6(a), and thus, are protected from disclosure pursuant to FOIA Exemption (b)(1).

## II.     *FOIA Exemption (b)(3)*

FOIA Exemption (b)(3) protects from disclosure materials that are "specifically exempted from disclosure by statute . . . provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld."   5 U.S.C. § 552(b)(3).   Exemption (b)(3), which may be invoked independently of Exemption (b)(1), *see Gardels v. CIA*, 689 F.2d 1100, 1107 (D.C. Cir. 1982), differs from other FOIA exemptions in that its applicability is not dependent on the factual contents of specific documents, but on the "existence of a relevant statute and the inclusion of withheld material within that statute's coverage," *Goland v. CIA*, 607 F.2d 339, 350 (D.C. Cir. 1978); *see also Miller*, 730 F.2d at 777.

The CIA asserts that its decision to invoke Exemption (b)(3) is proper under the terms of both the National Security Act of 1947 ("National Security Act"), 50 U.S.C. § 403-3(c)(6)

12

(2000),[9] and section 6 of the Central Intelligence Agency Act of 1949 ("CIA Act"), codified as amended at 50 U.S.C. § 403g (2000), both of which were in effect at the time plaintiff made his original FOIA request. (Def.'s Mot. Summ. J. at 14-15.)  At the time of plaintiff's request, the National Security Act required the DCI to "protect intelligence sources and methods from unauthorized disclosure."  50 U.S.C. § 403-3(c)(6).  The Supreme Court established in *CIA v. Sims*, 471 U.S. 159 (1985), that the National Security Act's provision calling for the DCI to protect "intelligence sources and methods" is sufficiently specific as to the type of matters falling within its scope and "thus qualifies as a withholding statute under Exemption [(b)](3)." 471 U.S. at 167.  Under circumstances similar to those currently before the Court, where the CIA has refused to confirm or deny the existence of responsive records, our Circuit has found that the "proper standard to determine whether the [National Security Act] applies to such a situation is whether the CIA demonstrates that an answer to the query 'can reasonably be expected to lead to [the] unauthorized disclosure of intelligence sources and methods.'" *Gardels*, 689 F.2d at 1103 (quoting *Halperin*, 629 F.2d at 147); *see*

---

[9]     At the time of plaintiff's original FOIA request, the National Security Act required the Director of Central Intelligence ("DCI") to "protect intelligence sources and methods from unauthorized disclosure."  Although this statute was subsequently repealed by the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, S. 2845 (2004) (transferring authority to protect intelligence sources and methods to the Director of National Intelligence), section 403-3(c)(6) is still operative here because it was in effect at the time of plaintiff's original FOIA request.  *See Pub. Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1284 (D.C. Cir. 1983) (indicating that to invoke Exemption (b)(3), an agency must be able to demonstrate that the statute being invoked in conjunction with Exemption (b)(3) "was in effect at the time of the FOIA request"); *see also King v. U.S. Dep't of Justice*, 830 F.2d 210, 216 (D.C. Cir. 1987) (indicating that for purposes of Exemption (b)(1), a classification decision should be considered in regard to the terms of the Executive Order under which the decision was made).

*also Wolf v. CIA*, 357 F. Supp. 2d 112, 117 (D.D.C. 2004).

Section 6 of the CIA Act—which our Circuit Court has held to be an exempting statute for the purposes of Exemption (b)(3), *see Halperin*, 629 F.2d at 147; *Weissman*, 565 F.2d at 694—makes the CIA exempt from laws requiring the "publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency," 50 U.S.C. § 403g.  Under section 403g, "[o]nly the specific information on the CIA's personnel and internal structure that is listed in the statute will obtain protection from disclosure." *Baker v. CIA*, 580 F.2d 664, 670 (D.C. Cir. 1978).

The affidavit supplied by the Agency in this case sufficiently shows that confirming or denying the existence of records responsive to plaintiff's request would violate the terms of both the National Security Act and section 6 of the CIA Act.   Plaintiff requests information relating to CIA agents' "activities, assistance, participation, involvement, and contacts." (Dorn. Decl. ¶ 35; *see also id.* Ex. 1.)  The CIA asserts that any records related to these requests would speak to the "functions" of CIA agents (*id.* ¶ 35), information that is specifically exempted under section 6 of the CIA Act, 50 U.S.C. § 403g.  Moreover, the CIA asserts that the "functions" of CIA agents are "inextricably tied to the intelligence sources and methods" used to achieve the Agency's primary purpose, which is the collection of foreign intelligence.  (*Id.* ¶ 35.)  It is evident that because the materials requested by plaintiff are pertinent to the Agency's intelligence sources and methods, an answer to plaintiff's request confirming or denying the existence of such materials could "'reasonably

be expected to lead to [their] unauthorized disclosure.'" *Gardels*, 689 F.2d at 1103 (quoting *Halperin*, 629 F.2d at 147).  The CIA's response was therefore also appropriate under the National Security Act.

Accordingly, the Agency has thus met its burden related to the invocation of Exemption (b)(3) by establishing that two relevant disclosure-prohibiting statutes exist and that the withheld materials fall within the coverage of those statutes.  *See Sims*, 471 U.S. at 167.

### III.   *Legal Sufficiency of the Dorn Declaration*

Next, plaintiff challenges the legal sufficiency of the Dorn Declaration and contends that the Court should conduct an in camera inspection of any documents responsive to his May 17, 2000 request.  (Pl.'s Opp'n to  Def.'s Mot. Summ. J. & Cross Mot. in Supp. of Summ. J. ("Pl.'s Opp'n & Cross Mot.) at 2.)  Plaintiff argues that in camera review of the documents is particularly necessary in this case "[b]ecause the CIA has refused to produce its minimum burden of a *Vaughn* [i]ndex" (*id.*), or itemized index of documents that correlates statements made in an agency's refusal justification with the actual document or portion of the document withheld under a specific FOIA exemption, *see Vaughn v. Rosen*, 484 F.2d 820, 827 (D.C. Cir. 1973).

While the *Vaughn* court found that FOIA exemptions could not be justified by conclusory terms alone, it nonetheless recognized that the analysis required "would not have to contain factual descriptions that if made public would compromise the secret nature of the

15

information." 484 F.2d at 826; *see also Hayden*, 608 F.2d at 1384-85. More specifically, our Circuit has held that a response neither confirming nor denying the existence of materials responsive to a FOIA request—referred to as a "Glomar" response—"is appropriate where an acknowledgment that records exist would provide the requester with the very information the exemption is designed to protect." *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 894 n.8 (D.C. Cir. 1995); *see also Students Against Genocide v. Dep't of State*, 257 F.3d 828, 834 n.9 (D.C. Cir. 2001). As plaintiff recognizes, a "Glomar" response "does not [however,] relieve [an] agency of its burden of proof, nor does it relieve the District Court of its congressionally mandated obligation to make a *de novo* determination of the propriety of the agency's claim." (Pl.'s Opp'n & Cross Mot. 9 (citing *Phillippi,* 546 F.2d at 1013).) In that regard, the case of *Miller v. Casey,* 730 F.2d 773 (D.C. Cir. 1984), is instructive.

In *Miller,* our Circuit Court found that the CIA met its burden relating to the withholding of responsive documents pursuant to Exemptions (b)(1) and (b)(3) through the submission of an affidavit justifying its refusal to reveal whether the requested documents exist. 730 F.2d at 776-78. The FOIA request at issue in *Miller* sought information related to "attempts by the [United States], [United Kingdom], and other western countries to infiltrate intelligence agents . . . into Albania during the period between the end of World War II and the death of Stalin in 1953." *Id.* at 774. The affidavit submitted by the CIA in *Miller* set forth several reasons why the national security and foreign relations would be threatened if it confirmed or denied the existence of the documents. *Id.* at 775-76. The

16

affidavit claimed that, *inter alia*, "disclosure might hamper future relations with Albania, . . . a pattern of denials or affirmances would permit hostile nations to piece together a catalog of U.S. covert missions, . . . acknowledgment could hamper future recruitment of sources, and . . . acknowledgment would reveal the particular intelligence method—infiltration of agents—allegedly used in the mission." *Id.* at 775-76 (citation omitted). As such, the Court in that case ruled that the affidavit "specifically and suitably" responded to the request.[10] *Id.* at 776.

Plaintiff's FOIA request here, like the request at issue in *Miller*, seeks the disclosure of information pertaining to CIA activities in a foreign land. Plaintiff argues, however, that although "the *Miller* court provides a powerful statement," our Circuit Court's ruling there is not applicable to the present situation due to dissimilarities between Albania, the target of the request in *Miller*, and Paraguay. (Pl.'s Opp'n & Cross Mot. at 14-15.) According to plaintiff, *Miller* is distinguishable from the present case because Albania was a "puppet government" under the control of the Soviet Union, which was in a nuclear-standoff with the United States, whereas Paraguay is a small country with a recent history of stable relations with the United States and "has never posed any real threat in our Country's history." (*Id.*

---

[10]     Similarly, our Circuit found in *Frugone v. CIA* that summary judgment for the CIA was warranted because the Agency's affidavit "persuasively describ[ed], both generally and with reference to [the] case, the untoward consequences that could ensue were it required either to confirm or to deny" the existence of material responsive to the FOIA request. 169 F.3d 772, 775 (D.C. Cir. 1999). *Frugone* involved a FOIA request made by a resident of Chile who claimed to have worked as a "covert employee" of the CIA. 169 F.3d at 773. The Agency provided a "Glomer" response, indicating that "except in those instances wherein [the Agency has] officially acknowledged a relationship with an individual, [the Agency is] unable to so acknowledge." *Id.*

at 14-15.)  Plaintiff argues that although the court's finding in *Miller* was justified by Cold War-related security concerns present during that time period, the "current War on Terror is not the Cold War," and there is no foreseeable harm that would result from permitting some level of access to the documents related to CIA activities in Paraguay.  (*Id.* 14-15.)  I disagree.

Contrary to plaintiff's contention, defendant's affidavit justifying its "Glomar" response successfully identifies several "foreseeable harm[s]" that could result from official acknowledgment as to the existence or nonexistence of documents responsive to the request. In its affidavit describing its decision, defendant asserts, *inter alia*, that official acknowledgment of clandestine CIA activities in a country "might hamper future foreign relations with the government of that country" (Dorn. Decl ¶ 37); "could seriously damage [America's] ability to retain present sources and recruit new sources" (*id.* ¶ 23); and would allow foreign intelligence services to "redirect [their] resources to identify potential CIA operations and sources, . . . and generally enhance [their] intelligence activities at the expense of the United States" (*id.* ¶ 33).  The potential harms described in the affidavit are similar to those that our Circuit found to be sufficient for summary judgment in *Miller*, in that they "flow[] plausibly from an admission or denial" of U.S. involvement in Paraguay.  730 F.2d at 777.

Furthermore, plaintiff is also mistaken in his claim that the affidavit justifying the CIA's decision to provide a "Glomar" response is "overbroad and sweeping."  (Pl.'s Opp'n

& Cross Mot. at 1.) As previously established, the Dorn Declaration describes in reasonably specific detail why confirming or denying the existence of documents could logically lead to the unauthorized disclosure of the CIA's intelligence sources and methods, *see* 50 U.S.C. § 403-3(c)(6), reveal information related to the Agency's personnel and internal structure, *see* 50 U.S.C. § 403g, and cause damage to national security, *see* Exec. Order No. 12958 § 1(4). (*See* Dorn Decl. ¶¶ 15-38.) *See also Military Audit Project*, 656 F.2d at 738; *Hayden*, 608 F.2d at 1387; *Weissman*, 565 F.2d at 697.

Thus, this Court finds that the CIA has shown with reasonably specific detail that disclosing the existence or nonexistence of records responsive to plaintiff's request would provide plaintiff with "the very information the exemption is designed to protect." *Nation Magazine*, 71 F.3d at 894 n.8. The CIA was justified in its employment of a "Glomar" response.

## IV.   *Prior Official Acknowledgment of Information Responsive to Plaintiff's Request*

Finally, plaintiff contends that because previously released materials "acknowledge CIA activities, relationships, and intelligence interests in the Southern Cone countries of South America, including Paraguay, as part of the [A]gency's involvement in Operation Condor," defendant's affidavit was submitted in bad faith (Pl.'s Opp'n & Cross Mot. at 12-13) and is contradicted by evidence in the record (Pl.'s Reply at 9). Once again, I disagree.

Summary judgment on the basis of affidavits requires that the affidavits not be "controverted by either contrary evidence in the record nor by evidence of agency bad faith."

19

*Military Audit Project*, 656 F.2d at 738; *see also Hayden*, 608 F.2d at 1387; *Weissman*, 565 F.2d at 697.  Our Circuit has established that the "government may not rely on an otherwise valid exemption to justify withholding information that is already in the public domain." *Students Against Genocide*, 257 F.3d at 836 (citations omitted).  The fact that some information regarding a certain subject exists in the public domain, however, "does not eliminate the possibility that further disclosures can cause harm to intelligence sources, methods, and operations." *Students Against Genocide*, 257 F.3d at 835 (citing *Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990)).  Accordingly, our Circuit requires that a plaintiff alleging prior disclosure bear the burden of producing "specific information in the public domain" that duplicates the withheld material. *Afshar*, 702 F.2d at 1130.  Plaintiff has not done so here.

For an item in a FOIA request to be considered "officially acknowledged," and thus subject to compelled disclosure over an otherwise valid exemption claim, the information requested:  (1) "must be as specific as the information previously released;" (2) "must match the information previously disclosed;" and (3) "must already have been made public through an official and documented disclosure." *Fitzgibbon*, 911 F.2d at 765 (citing *Afshar*, 702 F.2d at 1333); *see also Public Citizen v. Dep't of State*, 11 F.3d 198, 202 n.4 (D.C. Cir. 1993) (stating that the criteria established in *Afshar* is equally applicable to Exemptions (b)(1) and (b)(3) in cases in which Exemption (b)(3) is invoked to protect intelligence methods and sources).  Plaintiff asserts that documents released through the Intelligence Authorization Act

for Fiscal Year 2000—also known as the "Hinchey Amendment,"[11] the Chile Declassification Project,[12] and the Argentina Declassification Project[13]—"acknowledge CIA activities, relationships, and intelligence interests in the Southern Cone countries of South America, including Paraguay, as part of the [A]gency's involvement in Operation Condor."[14] (Pl.'s Opp'n & Cross Mot. at 13.) According to plaintiff, the only difference between the documents he requests and those already produced by the CIA is "the country from where

---

[11]     The Hinchey Amendment mandated that the Agency submit to Congress documentation of its involvement in: (1) the 1973 assassination of President Salvador Allende; (2) General Augusto Pinochet's accession to the Presidency of the Republic of Chile; and (3) human rights violations committed by Pinochet's officers and agents. (Pl.'s Opp'n & Cross Mot. at 3; *see also* Pl.'s Opp'n & Cross Mot. Ex. 6). The CIA responded to the congressional mandate in September of 2000 when it issued the Hinchey Report on "CIA Activities in Chile" ("Hinchey Report") (Pl.'s Opp'n & Cross Mot. Ex. 6), indicating that the response "should be viewed as a good-faith effort to respond in an unclassified format" to the questions posed by Congress, (*id.* at 2).

[12]     The Chile Declassification Project was an interagency effort coordinated by the National Security Council on behalf of the President that resulted in the release of over 20,000 newly declassified and other documents related to human rights abuses, terrorism, and other acts of political violence prior to and during the Pinochet era in Chile from 1968-1991. (Pl.'s Opp'n & Cross Mot. Ex. 7; *see also id.* Ex. 4, Ex. 5.) The project featured the release of documents on three separate occasions. (*Id.* Ex. 7.) The first release on June 30, 1999, consisted of approximately 5,800 documents, 490 of which were from the CIA. (*Id.* Ex. 4.) The second release, which occurred on October 8, 1999, consisted of over 1,100 documents, including roughly 160 from the CIA. (*Id.* Ex. 5.) The official statement accompanying the third and final release of documents on November 13, 2000, indicates that an additional 16,000 documents were released at that time, but it is not specific as to what portion of those documents may be attributed to the CIA. (*See id.* Ex. 7.)

[13]     Plaintiff also references the Department of State's August 20, 2002 release of approximately 4,700 newly declassified documents related to human rights abuses and political violence in Argentina from 1975 to 1984. (Pl.'s Opp'n & Cross Mot. Ex. 8.)

[14]     According to the Hinchey Report, Operation Condor was an "intelligence-sharing arrangement among Chile, Argentina, Brazil, Paraguay and Uruguay" (Pl.'s Opp'n & Cross Mot. Ex. 6 at 4), which was built on "informal cooperation in tracking and . . . killing political opponents" (*id.* at 10).

21

they came." (Pl.'s Opp'n & Cross Mot. at 2.) He argues that "[d]ocuments disclosed through the Chile and Argentina Declassification projects . . . reveal that U.S. government agencies, including the CIA . . . were aware of 'Operation Condor,' monitored the actions of the participating nations, and at times participated themselves." (Pl.'s Reply at 8.)

Plaintiff clearly fails to satisfy his burden of "pointing to specific information in the public domain" that shows that the information sought has been officially acknowledged. *Afshar*, 702 F.2d at 1130. In his May 17, 2000 FOIA request, plaintiff specifically asked for information regarding the CIA's activities in connection with General Stroessner's ascension to power, the assistance it provided in the creation or operation of an office of the Paraguayan government, the Agency's participation in coordination among the security agencies in the Southern Cone, the Agency's involvement in the deposition of General Stroessner, and the Agency's contacts with General Lino Oviedo. (*See* Dorn Decl. ¶ 5.) Although plaintiff is able to demonstrate that some previously released documents "mention Paraguay and General Stroessner"[15] (Pl.'s Reply at 8-9; *see also* Pl.'s Opp'n & Cross Mot. Ex. 9) and that documents released through the Declassification Projects "deal with all of the countries involved in 'Operation Condor'" (Pl.'s Reply at 7; *see also* Pl.'s Opp'n & Cross Mot. Ex. 9), there is no evidence in the record demonstrating that the CIA engaged in any of

---

[15]      It is important to note that the three documents identified as having been disclosed by the State Department (*see* Pl.'s Opp'n & Cross Mot. Ex. 9 at 2, 4, 5) may not be used as evidence demonstrating that the CIA has officially acknowledged the existence of documents responsive to the plaintiff's request. Our Circuit Court has indicated that it does "not deem 'official' a disclosure made by someone other than the agency from which the information is being sought." *Frugone*, 169 F.3d at 774.

the activities identified by plaintiff's FOIA request. Thus, plaintiff has not demonstrated with sufficient particularity that the information sought has been officially acknowledged.

Additionally, it follows that plaintiff fails to demonstrate that the CIA's affidavit is contradicted by evidence in the record. In the absence of a demonstration that the specific information sought has been officially acknowledged, it is irrelevant to the Court's determination whether the Agency has previously declassified similar information pertaining to other countries in the region. *See Fitzgibbon*, 911 F.2d at 765-66. Therefore, in light of plaintiff's failure to produce evidence of specific information in the public domain that duplicates the information sought in his request, this Court must accept as true defendant's assertion that there has been "no prior official CIA acknowledgment of any of the activities or relationships outlined in [p]laintiff's requests" (Dorn Decl. ¶ 39) and reject plaintiff's arguments to the contrary.

## CONCLUSION

Accordingly, for the foregoing reasons, the Court GRANTS defendant's Motion for Summary Judgment and DENIES plaintiff's Cross-Motion. An appropriate Order will issue with this Memorandum Opinion.

RICHARD J. LEON
United States District Judge

23